JACOB H. BROWN, respondent,

*v.*

WILLIAM BERRY, appellant.

[Decided May 20th, 1918.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Stevenson, who filed the following opinion:

This memorandum will not undertake to discuss this case in all its aspects. While the evidence and arguments of counsel are fresh in my mind, I shall rest my decision of the cause in favor of the complainant upon the consideration of certain facts which are for the most part admitted, or which I think have been clearly proved.

The bill is filed under "the act to compel the determination of claims to real estate in certain cases, and to quiet the title to the same," commonly and somewhat misleadingly called the "Act to quiet titles." The complainant conveyed the land in question, a farm of eighty-two acres, to the defendant, William Berry, and one Eleazer Thompson, now deceased, whose heirs or devisees are co-defendants with Berry. The price was $6,000, for one-half of which ($3,000) the complainant took back a purchase-money mortgage dated June 23d, 1873, and payable in two years with interest at seven per cent. The price paid seems to have been large, but Mr. Berry testified that the purchase was made with the idea that there was a deposit of ore on the land, and that he and his co-speculator sunk several shafts during two or three years after the purchase and were disappointed in their expectations.

In the year 1878 the interest was in arrear. There was a small house on the land which rented for seven or eight dollars a month. A portion of the land also was tillable, but a large part seems to have been mountain land. It does not appear that any substantial rent could be obtained for the land beyond the seven or eight dollars per month for which the house and accompanying curtilage could be let.

In 1878, the tenant of Messrs. Thompson & Berry had vacated and a "squatter" named Ridenor had taken possession. Mr. Brown, who had received the land by devise from his father, and had lived on it in former years, desired to have his claim settled in some way, and no doubt was willing to take possession. He was temporarily residing or staying on the adjacent farm with his brother. An interview then took place which Mr. Brown thinks was near his brother's farm, but which Mr. Berry says was at his (Berry's) place at Westwood, Bergen county, New Jersey, a place quite remote from the farm. The indications are that Mr. Berry is right. It is important to know precisely what took place at this interview, and fortunately there is very little dispute between the only witnesses who can testify in regard to it. Mr. Brown had been dunning Mr. Berry for interest on his mortgage for some time and none had been paid. At least none had been

received by Mr. Brown for several years. According to Mr. Brown he told Mr. Berry that something must be done as he wanted money and that Mr. Berry said: "I can't pay you. You go back on the place." Mr. Brown then referred to the occupant, Mr. Ridenor, and, according to Mr. Berry, there was a dispute as to whether there was any such person on the place. The result of the talk was that Berry gave Brown a letter addressed to the occupant which reads as follows:

"WESTWOOD, Sept. 2, 1878.

*"DeWitt Ridenor, Esq.*

"DEAR SIR—I understand this day from Jacob Brown that you have taken possession and occupy the premises, formerly owned by him and now owned by Mr. Thompson and myself. I hereby order you to vacate the same immediately under penalty of the law; deliver the key to Jacob Brown.

"Truly yours,

"WM. BERRY."

Mr. Brown, who, presumably, would not be recognized by the occupant, Ridenor, as the owner of the property, delivered the letter to Ridenor and the latter forthwith vacated the premises and Mr. Brown and his family took possession.

I find nothing in the testimony of Mr. Berry which essentially modifies the transaction between himself and Mr. Brown, on September 2d, 1878, as that transaction is described in Mr. Brown's deposition. I may say that Mr. Berry's manner of testifying, and the air of superiority and control which he assumed, did not add to the credibility of his testimony. I think, however, while he added a little deceptive color he did not testify to anything which alters the character of the transaction as a surrender of mortgaged premises by a mortgagor who was behindhand in his interest to the mortgagee. In a somewhat lofty manner Mr. Berry says that Mr. Brown came to him stating that he had "spent all his money and had to move and had no place to move in, and wanted to know whether he could move in there." Berry adds:

"I said, under certain circumstances on account of his wife who used to live with us and we thought a great deal of her. On her account he could move in the place, but he should pay the taxes, and—well, move right away,"

and then follows the account of the talk about Ridenor's occupation ending with the letter to Ridenor.

It was argued by one of the counsel for defendants that Berry and Brown made a contract by which Brown was to take possession and the use of the property should keep down the interest. I find absolutely nothing even in Mr. Berry's testimony to suggest such a contract. It may be observed that the interest on Mr. Brown's mortgage was $210 per annum, while the rent of the house was seven or eight dollars per month, say $100 a year, to which perhaps a small additional amount might be charged against Mr. Brown on account of such portion of the farm as he intended to cultivate. Mr. Berry may well have expressly charged upon Mr. Brown, the mortgagee whom he was suffering to take possession with the performance of his (Brown's) duty as mortgagee in possession, to pay the annual taxes which were less than the rental value, but such an understanding or agreement would not affect the character of Mr. Brown's possession.

I see no reason to doubt that in this case the transaction between Berry and Brown was of the usual character where the mortgage is overdue, the interest in default and the only resident mortgagor is insolvent. The mortgagee in such cases often takes possession with the consent of the mortgagor.

From the time Brown took possession of the farm, in 1878, until the commencement of this suit, in 1915, a period of thirty-seven years, it is proved and not contested that neither Berry nor Thompson, nor any successor to Thompson, has made the slightest effort to interfere with the mortgagee's possession or to do any act which in any way affects the character of that possession. During that period no interest has been paid on the mortgage by anyone. Mr. Brown testifies that he does not remember having seen Mr. Berry after the interview of 1878, and that he never spoke to Mr. Thompson after that time. Mr. Brown remained in personal possession and occupation of the farm with his family as a resident from 1878 until the death of his wife, in 1908, a period of thirty years, and since that time he has rented the place to tenants from whom he has collected the rent.

In January, 1885, the farm was sold for taxes and bought in by the township committee of Pompton township for a term of

thirty years. The complainant, Brown, testifies that his poverty caused his default in the payment of taxes, and the circumstances indicate that he did not suffer this default in order to injure the owners of the equity of redemption or anyone else. It appears that after this sale was made the township held this term for about two years but made no effort to dispossess Mr. Brown. In February, 1887, Brown paid the township $25, which the township clerk says was entered on the township books as rent for the farm, and Mr. Brown seems to assent to that idea.

On April 29th, 1887, the township committee transferred their certificate of sale to George W. Mickens, Mr. Brown's brother-in-law. Mr. Mickens testified that he bought the term merely to save the home of his sister and her husband; that he made no effort to collect any rent, and that the understanding between himself and his brother-in-law was that he would hold the assigned term merely as security for the repayment to him of the amount which he paid the township committee. Mr. Brown and Mr. Mickens testify, and there is no other testimony on the subject, that in the course of a long period of years Brown paid back to Mickens the exact amount which Mickens had paid the township committee with interest, and that all claims of Mr. Mickens under the assignment of the term thereupon were discharged.

When Mr. Berry heard of the sale for taxes he consulted counsel, he says, and learned that he could do nothing, and thereupon apparently conceived the idea that he could await the expiration of the term, take possession of the land as owner while the mortgage would be met with the absolute bar of the statute of limitations. There is some conflict in regard to this matter between counsel for Berry and counsel for the Thompson heirs. Counsel for the Thompson heirs, in arguing that Berry and Brown, in 1878, agreed that the occupation by Brown should discharge the interest on the mortgage, seems to point to the conclusion that the mortgage now stands with the interest paid from year to year in full, and that the decree in this cause in fixing and settling "the rights of the parties in said lands" should find that the defendants were the owners of the equity of redemption

and that Brown is in possession under his mortgage upon which the principal only is now due.

Neither Berry nor Thompson, nor any heir or devisee of Thompson, made inquiry in regard to the status of this tax title. If they had made inquiry of Mr. Mickens they would have learned that he was not claiming to hold the tax title in any other way than as a mortgage.

I cannot adopt the views set forth in the answer or urged in the argument in regard to the character of Mr. Brown's possession during the twenty-eight years between the time when Mr. Mickens radically changed the character of the outstanding tax title in 1887 and the commencement of this suit in 1915. We have seen that Brown entered into possession in 1878 as mortgagee. He was bound to pay the taxes. He could not acquire a tax title or have one acquired for his benefit which he could hold in hostility to the mortgagors. I do not consider that it is necessary to enter upon an elaborate discussion of the status of the parties concerned during the brief interval in which the township held this term of thirty years. The defendants still held the equity of redemption in the fee, and Mr. Brown still held his mortgage on the fee, and Mr. Brown remained in possession, having originally taken possession as mortgagee. Many interesting questions relating to this mortgage arise out of the default of Mr. Brown with respect to his duty to pay taxes; but I do not deem it necessary to discuss them. As between himself and Berry and Thompson he was still in possession during the period when this tax title was outstanding as mortgagee and not otherwise, while as between himself and the township he might have been regarded as a tenant.

However this may be, I think that the correct legal conclusion is that when Mr. Mickens took an assignment of the tax title as a mere security for repayment to him of the amount of the tax lien, there can be no doubt that Mr. Brown's possession became again, if it had not been continuously from the start, the possession of a mortgagee under his mortgage. He had no other title. He was not Mr. Mickens' tenant. When he had repaid the taxes to Mr. Mickens he had only performed the duty which he owed

to the mortgagors and the situation was precisely the same as it would have been if Mr. Brown had made no default and there had been no tax title.

It is unnecessary to cite the authorities which hold that where a mortgagee takes possession under his mortgage, and holds possession for twenty years with no payment of interest and no agreement modifying the transaction, the equity of redemption is extinguished. Sometimes this title which the mortgagee in possession acquires has been confused with a title by adverse possession. It is not the adverse possession which ripens into an absolute title in the case of a mortgagee. The mortgagee is in possession under a conveyance of the fee. Anciently, the mortgagor lost all title in case the condition was not performed by him within the time stated—*i. e.*, in case the money was not paid according to the condition of the mortgage. Our law now allows the mortgagor to redeem within twenty years and limits him to that period. On the other hand, our modern law limits the right of the mortgagee to foreclose for the same period of twenty years. At any time during a period of twenty years, either from 1878 or from 1887, when Mr. Mickens bought the tax title—I have not considered it important to determine which would be the correct date—the defendants could have filed a bill to redeem, and it is hardly necessary to point out that Mr. Brown could not have set up the tax title in any way against them.

In rendering his account as mortgagee in possession, Mr. Brown would have been credited with the interest upon his mortgage, and the amount of the taxes paid by him, and would have been charged with the rental value of the farm. On the other hand, Mr. Brown might have filed his bill to foreclose and he would have been obliged to render precisely the same account. After the expiration of twenty years from the correct date, whichever of the two before mentioned might be taken, the defendants lost their right to redeem and the complainant lost his right to foreclose, and the complainant, in my judgment, plainly is in possession under his mortgage deed, and under that deed holds an absolute title in fee, the equity of redemption formerly in the defendants having expired.

I have not referred to the improvements which Mr. Brown has made, the extension of the residence, &c., because I do not understand that there is any evidence going to show that Mr. Berry or any of the defendants had notice of such improvements.

A decree will be advised for the complainant according to section 6 of the statute. *4 Comp. Stat. p. 5402 § 6.*

*Messrs. Howe & Davis,* for the respondent.

*Messrs. Hudson & Joelson,* for the appellant.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Stevenson.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD. PARKER, BERGEN, MINTURN, KALISCH, BLACK, WHITE, HEPPENHEIMER, WILLIAMS—11.

*For reversal*—None.